Cecil LAWLOR, Plaintiff-Appellee,

v.

SOCONY–VACUUM OIL COMPANY, Inc., now known as Socony-Mobil Oil Company, Inc., Defendant and Third-Party Plaintiff-Appellant,

and

Bethlehem Steel Company, Third-Party Defendant-Appellant.

No. 176, Docket 25878.

United States Court of Appeals Second Circuit.

Argued Feb. 3, 1960.

Decided March 8, 1960.

---

Bernard Chazen, Hoboken, N. J. (Nathan Baker, Milton Garber, and Baker, Garber & Chazen, Hoboken, N. J., on the brief), for plaintiff-appellee.

Herbert C. Smyth, New York City, for defendant-appellant Socony-Mobil Oil Co., Inc.

Frank A. Bull, New York City (Mendes & Mount, New York City, on the brief), for third-party defendant-appellant Bethlehem Steel Co.

Before MEDINA and WATERMAN, Circuit Judges, and MADDEN, Judge, United States Court of Claims.*

MEDINA, Circuit Judge.

At least since Pope & Talbot, Inc. v. Hawn, 1953, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143, it has been common practice in this Circuit and elsewhere in diversity cases for an injured shore-based worker who claims he was doing the type of work traditionally done by seamen but who was employed by third parties, such as stevedores and shipyards, to sue the shipowner on the law or civil side of the District Courts, alleging both unseaworthiness of the vessel and negligence as a basis for recovery and demand a jury trial. That is what was done in this case. Cecil Lawlor was employed by Bethlehem Steel Company at its Staten Island shipyard and during her lay-up in the shipyard for annual overhaul was supervising the men engaged in marking up places in the tanks of the tank vessel Mobilfuel where there were leaks and cracks in the bulkheads leading from one tank to another. A series of scaffolds and ladders belonging to Bethlehem had been put in place by the Bethlehem men and the ladder leading from the last scaffold to the bottom of one of the tanks was almost perpendicular, but it was not fastened to the scaffold; and the ladder fell backwards as Lawlor descended it and he was precipitated to the bottom of the tank and seriously injured. At the close of the evidence Judge Conger dismissed the negligence count against the shipowner, Socony-Mobil Oil Company, Inc. but sent the case to the jury on the charge of unseaworthiness and the jury found the vessel unseaworthy; they also found contributory negligence by

Lawlor which reduced the recovery, and the net result was a judgment in favor of Lawlor against the shipowner and a recovery over against Bethlehem on a third party claim. Both Socony-Mobil and Bethlehem appeal.

Thus we have for decision the interesting question specifically left open for future consideration by the Supreme Court in United New York and New Jersey Sandy Hook Pilots Ass'n v. Halecki, 1959, 358 U.S. 613, footnote 7 on page 618, 79 S.Ct. 517, on page 520, 3 L.Ed.2d 541: whether a shipowner can be liable for the unseaworthiness of a vessel "to a shore-based worker who performs labor on a ship which is not ready for a voyage but is out of navigation and docked in a private shipyard for its annual overhaul and repair."

The accident occurred on June 30, 1954. On June 24 the vessel arrived at the Bethlehem shipyard; she left on July 2. She was in dry dock for a few days for the customary repairs to and painting of the bottom, propellers and so on. Then she was moored in navigable waters at Pier 3, where she remained until Lawlor was injured. She had a full crew of officers and men aboard performing seaman's duties but electric power and water were supplied from shore. The work called for by the contract with Bethlehem was the usual large number of miscellaneous items, including the finding of cracks and leaks in the tanks and repairing them. No structural changes in the vessel were to be made, nor did the contract call for anything in the nature of a major or substantial item of change or repair. The total cost of the work was $70,834 and the contract required performance in 14 days.

The scaffolds and ladders were the property of Bethlehem and Bethlehem had control of the particular part of the vessel where the leaks and cracks in the tanks were being located. We think it clear from the evidence that the shipowner was in general control of the vessel. As Bethlehem was in complete

* Sitting by designation.

charge and control of the scaffolds and ladders, and one of the Bethlehem men had carelessly failed to affix or tie to the scaffold the ladder which toppled over and caused Lawlor's injuries, we think the negligence count of the complaint was properly dismissed. If the recovery against the shipowner for breach of warranty of seaworthiness is sustained Bethlehem is liable on the third party claim over by the shipowner against it.

■ Recent holdings by the Supreme Court we think leave us no alternative other than to hold, as we do, that Lawlor was engaged in the type of work traditionally done by seamen. The Tungus v. Skovgaard, 1959, 358 U.S. 588, 79 S. Ct. 503, 3 L.Ed.2d 524; Pope & Talbot, Inc. v. Hawn, 1953, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143. See also Pinion v. Mississippi Shipping Co., D.C.E.D. La.1957, 156 F.Supp. 652. Chief Officer Bennett testified that at times when the vessel was not in a shipyard for repairs the location and the temporary repair of cracks and leaks in the tank bulkheads were done by him and by members of the crew under his supervision. Equipment, including ladders, was on board and it could be and was used for this purpose.

■ It is also settled law that the unseaworthiness doctrine may be applicable and the shipowner become liable even though the article that was defective or defectively put together was the property of the stevedore or shipyard that employed the shore-based worker who was injured. Alaska Steamship Co. v. Petterson, 1954, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798. See Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 100, 66 S.Ct. 872, 880, 90 L.Ed. 1099. Moreover, while the scope of the doctrine was first extended to a longshoreman in Seas Shipping Co. v. Sieracki, supra, and he was engaged in the work of loading or unloading the vessel, the theory was that he was "doing a seaman's work and incurring a seaman's hazards." There is nothing talismanic about the phrase "loading and unloading"; the unseaworthiness doctrine has been applied to

shore-based workers not directly engaged in loading and unloading, such as the carpenter doing some repair work in Pope & Talbot, Inc. v. Hawn, supra. The fact that Hawn was repairing something connected with the loading apparatus was a mere coincidence. The point was that he was a carpenter performing ship's service. The Tungus v. Skovgaard, 1959, 358 U.S. 588, 79 S.Ct. 503, 3 L.Ed.2d 524; Torres v. The Kastor, 2 Cir., 1955, 227 F.2d 664; Mesle v. Kea Steamship Corporation, 3 Cir., 1958, 260 F.2d 747.

In the cases involving many types of shore-based workers these workers were clearly entitled to benefits under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. § 901 et seq., but it was held nevertheless that such workers might recover against the shipowner, who was not their employer, where the shipowner was negligent or there had been a breach of warranty of seaworthiness. And in the case of unseaworthiness it was quite immaterial whether or not the shipowner was at fault.

Thus the critical question in this case is whether or not the fact that the Mobil-fuel was moored in navigable waters at the pier of the shipyard during her annual overhaul gives her a status such that there is no warranty of seaworthiness and no duty to Lawlor to maintain the vessel and her equipment in a seaworthy condition.

Before we attempt to ascertain the underlying principle controlling the case and discuss the pertinent authorities, we think one or two observations will simplify the problem. Thus we cannot see that the case would differ materially as a matter of basic reasoning if the injured man had been one of the crew of the vessel instead of an employee of Bethlehem. If Lawlor was doing the work traditionally done by seamen, as we have already found to be the case, he is in the same position as a member of the crew. Moreover, we do not think resort to a mere phrase such as "out of navigation" gets us very far. Surely a vessel that has hit

one of the submerged logs or other floating obstructions that plague our large harbors and has damaged her propellers so that she has to be towed to a shipyard for a day or two for repairs before continuing her voyage cannot fairly be said to have so changed her status as to eliminate any duty to the officers and crew on board to maintain the vessel and her equipment in a seaworthy condition until the repairs have been completed. Such a vessel is unable to move under her own power, she is still in navigable waters, and would seem to be no more "out of navigation" at the pier of a shipyard than she would be if moored to one of the municipal piers, awaiting tugs to move her to a place where the repairs to her propellers could be promptly made. Thus, if being "out of navigation" is a material factor, everything depends upon what we mean by "out of navigation" in the context of the doctrine of unseaworthiness. If we were pressed to decide whether the Mobilfuel was "out of navigation" in navigable waters moored at the Bethlehem pier, we would say she was not "out of navigation."

The most recent decision by the Supreme Court on this subject is West v. United States, 1959, 361 U.S. 118, 80 S.Ct. 189, 192, 4 L.Ed.2d 161. There the Mary Austin was removed from the "moth ball fleet" at Norfolk, Virginia, and turned over to a contractor for "a complete overhaul," so that she could be reactivated and put in condition for sea duty. It was held that an employee of the contractor could not recover for unseaworthiness as there was no duty on the part of the shipowner to maintain the vessel in a seaworthy condition. Six of the shipowner's men, a captain, chief mate, second mate, chief engineer, assistant engineer and steward were on board, but solely for the purpose of inspecting the progress of the work. The control of the entire vessel was at all times relevant to the issues in the case in the contractor. She was about as unseaworthy

as a vessel can be and still remain afloat [1] and she was turned over to the contractor "for the sole purpose of making her seaworthy."

As said by Mr. Justice Clark:

"It would appear that the focus should be upon the status of the ship, the pattern of the repairs, and the extensive nature of the work contracted to be done, rather than the specific type of work that each of the numerous shore-based workmen are doing on shipboard at the moment of injury."

Thus the test formerly adopted as the rule in this Circuit by our decisions in Halecki v. United New York and New Jersey S.H.P, Ass'n, 2 Cir., 1958, 251 F.2d 708, reversed, 1959, 358 U.S. 613, 79 S.Ct. 517, 3 L.Ed.2d 541, and Berge v. National Bulk Carriers Corp., 2 Cir., 1958, 251 F.2d 717, must be regarded as no longer applicable. As to a vessel in navigable waters that test was, as stated in Berge at page 718, "whether the work on which the plaintiff was engaged was of a kind that the crew of a vessel was accustomed to perform." And in Halecki we applied this test to a vessel in a shipyard for annual overhaul and repair. True it is that if the injured shore-based worker was engaged in work not traditionally or customarily performed by members of the crew of the vessel, as turned out to be the case in Halecki, there could be no recovery for unseaworthiness. But in Berge the vessel had been turned over to the shipyard to be reconstructed and rebuilt. The *ratio decidendi* of the case in this Court, however, was not that there was no warranty of seaworthiness because of the status of the vessel but "that the reconstruction of a ship was not traditionally the task of the crew" 251 F.2d at page 718. Now the problem must be approached from a different angle, for we had held it sufficient merely to require proof that the vessel was in navigable waters and that

---

1. "It is not as though the 'Mary Austin' had finished a voyage and was having repair work done before resuming business again." West v. United States, 3 Cir., 1958, 256 F.2d 671, 673.

the shore-based worker was engaged in seamen's work, and consequently the surrender or lack of surrender of control of the vessel to the shipyard had no relevancy. See 251 F.2d at page 711.

West, however, makes it clear that, at least in some cases, control of the vessel is a decisive factor, for there it was said:

"Petitioner overlooks that here the respondent had no control over the vessel or power either to supervise or to control the repair work on which petitioner was engaged. We believe this decisive against both aspects of plaintiff's dual theory" (negligence and unseaworthiness).

Thus we must grope for some rational basis for deciding this case, as we were required to do in the analogous situation of determining what factors brought a vessel within the intent of the general provisions of the Jones Act, 46 U.S.C.A. § 688. Cf. Bartholomew v. Universe Tankships, Inc., 2 Cir., 1959, 263 F.2d 437.

 We have concluded that the character of the work to be done by the shipyard, the presence or absence of a crew performing the customary work of seamen on shipboard, and the consequent measure of control or lack of control by the shipyard over the vessel as a whole, are the determining factors that rule the decision of this case. Doubtless cases will arise in which the question of fact relative to the degree of control exercised respectively by the shipowner and the shipyard may be difficult of resolution. But here we have no conversion of a prisoner of war transport into a passenger carrier for the families of overseas service men (Lyon v. United States, 2 Cir., 1959, 265 F.2d 219), nor extensive repairs amounting virtually to the reconstruction and rebuilding of the vessel (Berge, supra), nor a wholly deactivated vessel from the "moth ball fleet" (West, supra), nothing in the category of major repairs or structural and extensive changes in the vessel, but only a large number of relatively small miscellaneous items such as are generally included in an annual overhaul. While Bethlehem controlled the particular area where the scaffolds and ladders were put up and where the work of locating and repairing the leaks in the tank bulkheads was being performed, the shipowner had general control of the vessel and a full crew of officers and men were aboard. Under these circumstances we hold there was a warranty of seaworthiness by the shipowner running in favor of the crew and also in favor of shore-based workers on the vessel performing work customarily done by seamen.

It is clear that the ladder from which Lawlor fell was not properly secured to the scaffold and the instructions to the jury on the subject of unseaworthiness were perhaps more favorable to the shipowner than it was entitled to. In an event, we find no merit in the claim of error and it is even doubtful if the point now argued by appellant Socony-Mobil Oil Company, Inc. was properly raised at the trial.

Affirmed.