[Civ. No. 21649.   First Dist., Div. Two.   Jan. 18, 1965.]

OREN W. POLLOCK, Plaintiff and Appellant, v. STAND-ARD OIL COMPANY OF CALIFORNIA, Defendant and Respondent.

Nichols, Williams, Morgan & Digardi, Cyril Viadro and Edward M. Digardi for Plaintiff and Appellant.

Donahue, Richards & Gallagher and Joseph T. Richards for Defendant and Respondent.

AGEE, J.—In this personal injury action the trial judge directed the jury to return a verdict in favor of defendant. Plaintiff appeals from the judgment entered thereon.

Defendant, Standard Oil Company, entered into a written contract with Todd Shipyards Corporation under the terms of which Todd was to perform an annual overhaul of a Standard Oil barge. The work consisted mainly of sandblasting, repainting and minor repairs to the hull, deck and deck machinery. The total contract price was $9,345 and the work was to be completed in five working days.

Standard towed the barge to the Todd shipyard and Todd put it in drydock. After the hull had been sandblasted and repainted, Todd put the barge back in the water, tied it to one of its piers, and proceeded to complete the work.

Plaintiff was employed by Todd as a welder. He had finished patching two small holes on top of the deckhouse and was descending a metal ladder which ran up the side of the deckhouse from the main deck when he lost his footing on the first rung and fell to the deck below, thereby sustaining personal injuries. His complaint about the ladder and the cause of his fall will be discussed later.

This action is brought under the maritime law doctrine of unseaworthiness, under which it is unnecessary to establish negligence of the defendant shipowner and neither assumption of risk by the plaintiff nor negligence of plaintiff's employer is a defense and contributory negligence by plaintiff only operates to reduce his recovery. Under

this doctrine the duty of the owner to maintain the vessel and its appurtenances in a reasonably safe or "seaworthy" condition, not only for the members of the crew but also for workmen performing services on and for the direct benefit of the vessel, with the owner's permission, regardless of by whom employed, is absolute and nondelegable. (*Seas Shipping Co.* v. *Sieracki*, 328 U.S. 85, 90 [66 S.Ct. 872, 90 L.Ed. 1099]; *Lawlor* v. *Socony-Vacuum Oil Co.*, 275 F.2d 599, 602.)

However, the doctrine of unseaworthiness has no application if the vessel is in fact out of navigation. (*Roper* v. *United States*, 368 U.S. 20 [82 S.Ct. 5, 7 L.Ed.2d 1]; *West* v. *United States*, 361 U.S. 118 [80 S.Ct. 189, 4 L.Ed.2d 161].)

The question as to whether a vessel is "out of navigation" is one of fact and depends upon many factors and many circumstances. (*Roper* v. *United States, supra*; *West* v. *United States, supra*; *Lawlor* v. *Socony-Vacuum Oil Co., supra*.)

The critical question in the instant case is the same as that in *Lawlor* v. *Socony-Vacuum Oil, supra*, wherein it is said: "Thus the critical question in this case is whether or not the fact that the Mobilfuel was moored in navigable waters at the pier of the shipyard during her annual overhaul gives her a status [of being out of navigation] such that there is no warranty of seaworthiness and no duty to Lawlor to maintain the vessel and her equipment in a seaworthy condition."

The facts in *Lawlor* are very similar to those in the instant case and the United States Court of Appeals concluded that the trial judge was correct in submitting the issue of unseaworthiness to the jury. It accordingly affirmed the judgment in favor of plaintiff.

In *Lawlor*, defendant Socony-Vacuum had delivered one of its tankers to a shipyard (Bethlehem) under a contract to give the vessel its annual overhaul and repairs. The vessel was at first placed in drydock and later shifted back into the water to be tied up at one of the shipyard's piers for further repairs. Plaintiff, an employee of the shipyard, was injured in falling from a ladder which, through negligence of other shipyard employees, had not been secured to some overhead scaffolding.

The United States Court of Appeals stated: "We have concluded that the character of the work to be done by the shipyard, the presence or absence of a crew performing the customary work of seamen on shipboard, and the consequent measure of control or lack of control by the shipyard over the vessel as a whole, are the determining factors that rule the decision of this case. Doubtless cases will arise in which the

question of fact relative to the degree of control exercised respectively by the shipowner and the shipyard may be difficult of resolution. But here we have no conversion of a prisoner of war transport into a passenger carrier for the families of overseas service men [citation], nor extensive repairs amounting virtually to the reconstruction and rebuilding of the vessel [citation], nor a wholly deactivated vessel from the 'moth ball fleet' [citation], nothing in the category of major repairs or structural and extensive changes in the vessel, but only a large number of relatively small miscellaneous items such as are generally included in an annual overhaul. While Bethlehem controlled the particular area where the scaffolds and ladders were put up and where the work of locating and repairing the leaks in the tank bulkheads was being performed, the shipowner had general control of the vessel and a full crew of officers and men were aboard. Under these circumstances we hold there was a warranty of seaworthiness by the shipowner running in favor of the crew and also in favor of shore-based workers on the vessel performing work customarily done by seamen.'' (P. 604.)

We shall analogize the factual situation in *Lawlor* with that in the instant action. ▮▮▮ Our inquiry, of course, is whether the evidence in the instant case is sufficient to require the submission to the jury of the factual question as to whether the barge was ''out of navigation'' and thus not subject to the doctrine of unseaworthiness.

*Character of work done by shipyard.* It is substantially the same as in *Lawlor* and respondent Standard Oil makes no contention that it was not. Besides, *West* v. *United States, supra,* holds that the focus should be placed on the status of the ship, rather than the specific type of work which an injured shore-based workman was doing on the ship at the moment of injury. Moreover, it appears that the patching job being done by plaintiff is one which is customarily done by seamen.

*General control of the vessel. Lawlor* places significance upon the presence or absence of the crew. The subject barge carried a crew of two men, consisting of a tankerman and a bargeman. When the barge was actually in service, their duties were to handle the hoses and valves during the operation of filling the oil tanks on the barge and to work the pumps in the deckhouse during unloading operations. They were also responsible for general maintenance.

This crew of two men or the alternate crew of two men were on board the barge at all times during the performance of the work being done by Todd. Naturally, they did not do

any loading or unloading of oil during this period, nor did they do any maintenance work except to maintain their own quarters. Just as in *Lawlor*, Todd "controlled the particular area" where its work was being done and it would have been extremely difficult on a vessel the size of the barge for the crew to have engaged in any such work without interfering with the work being done by Todd.

Respondent's senior marine inspector testified that, during this period, the crew was "basically there for security of our equipment" and "also to point out where these items [of equipment] are to the shipyard people."

Other evidence bearing on the question of whether respondent Standard or Todd had general control over the barge is that another contractor directly employed by Standard was working aboard the barge on the fire extinguishing equipment at the same time as Todd was doing its work. This contractor was working independently of and had no connection with Todd.

The contract between Todd and Standard provided that Standard could stop Todd's work at any time. Moreover, the nature of the work being done by Todd did not require relinquishment of the general control of the vessel by Standard.

The trial judge expressly stated for the record that, in granting a directed verdict in favor of Standard, he was basing his ruling upon the *West* and *Lawlor* cases.

West was a nonjury case in which the trial judge made findings of *fact* which led him to conclude that the vessel was not subject to the doctrine of unseaworthiness. The Supreme Court stated the factual situation involved therein to be as follows: "The findings here, however, show that, for several years, the Mary Austin was withdrawn from any operation whatever while in storage with the 'moth ball fleet.' The water had been drained from her water system and an antirust preservative was injected therein. Her subsequent towing to Philadelphia was for the specific purpose of delivery to Atlantic [shipyard] to render her seaworthy. The representation of the repair contract specifications was that she was not seaworthy for a voyage and that the major repairs called for therein would be necessary before one would be undertaken. It is evident that the sole purpose of the ship's being at Atlantic's repair dock at Philadelphia was to make her seaworthy. . . . The Mary Austin, as anyone could see, was not in maritime service. She was undergoing major repairs and complete renovation, as the petitioner knew. Furthermore, he took

his orders from the contractor, not the shipowner. He knew who was in control. This undertaking was not 'ship's work' but a complete overhaul of such nature, magnitude, and importance as to require the vessel to be turned over to a ship repair contractor and docked at its pier for the sole purpose of making her seaworthy. It would be an unfair contradiction to say that the owner held the vessel out as seaworthy in such a case. It would appear that the focus should be upon the status of the ship, the pattern of the repairs, and *the extensive nature of the work contracted to be done,* rather than the specific type of work that each of the numerous shore-based workmen is doing on shipboard at the moment of injury.'' (Italics ours.)

As the intermediate appellate decision in the *West* case (*West* v. *United States,* 256 F.2d 671, 673) said: ''It is not as though the 'Mary Austin' had finished a voyage and was having repair work done before resuming business again.''

*Lawlor* found *West* to be no bar to a recovery by the plaintiff therein, saying that there was ''nothing [in *Lawlor*] in the category of major repairs, or structural and extensive changes in the vessel . . . .'' (275 F.2d at p. 604.) The total cost of repairs in *Lawlor* was $70,834 and the work was to be completed in 14 days.

Respondent cites *Union Carbide Corp.* v. *Goett,* 256 F.2d 449, for the proposition that where the type of work being done cannot be done by the regular crew but requires that the work be done by a drydock company having special facilities and equipment for such work, the doctrine of unseaworthiness does not apply.

*Goett* was decided in 1958, *West* was decided in 1959, and *Lawlor* was decided in 1960. Both *Goett* and *West* were cited by counsel to the court in *Lawlor.* (84 A.L.R.2d 615.) The court in *Lawlor* cited and followed the decision of the United States Supreme Court in *West* and did not even mention the United States Court of Appeals decision in *Goett.*

We have already quoted from the Supreme Court decision in *West* to the effect that ''the focus should be upon the status of the ship, the pattern of the repairs, and the extensive nature of the work contracted to be done, *rather than the specific type of work* that each of the numerous shore-based workmen is doing on shipboard at the moment of injury.'' (Italics ours.)

In *Lawlor,* as in the instant case, the vessel ''was in dry dock for a few days'' for, as stated therein, ''the custom-

ary repairs to and painting of the bottom, propellers and so on.'' (275 F.2d at p. 601.) Certainly, the regular crew could not have done this type of work but that did not prevent the court in *Lawlor* from applying the doctrine of unseaworthiness.

We have concluded that the issue as to whether the barge in the instant case was "out of navigation" so as to bar the application of the doctrine of unseaworthiness is a question of fact to be determined in the first instance by the jury and that it was error for the trial judge to grant a directed verdict upon this ground.

■ The remaining issue is whether the evidence is sufficient to support a finding of unseaworthiness. The trial judge stated for the record that he did find it to be sufficient and that he was not granting the directed verdict upon this basis. However, respondent has raised the point in its brief on appeal. We shall, as we must, view the evidence in the light most favorable to the plaintiff-appellant. (*Estate of Lances,* 216 Cal. 397, 400 [14 P.2d 768].)

Toward the end of the job and while the barge was moored to the pier, plaintiff was directed by Todd to patch two small holes on top of the deckhouse. The only way for him to get up there was by a metal ladder which ran up the side of the deckhouse from the main deck.

Just below the top of the deckhouse and slightly above the top rung of the ladder there was a large fuel pipe which ran horizontally along the side of the deckhouse. It was between the ladder and the deckhouse and was in close proximity to the top rung. The presence of this pipe restricted the ''toe clearance'' on the top rung.

The ladder had side rails which were curved at the top in order to serve as a handhold when stepping down or climbing up onto the rungs of the ladder. A painter had been spot painting in this area while plaintiff was doing the patching job and had applied a spot of paint to the right handrail where it was curved and where it would be used as a handhold.

When plaintiff had finished the patching, he started to descend by turning around at the edge of the top of the deckhouse to face the ladder and deckhouse. He had his left foot on the edge of the deckhouse and his left hand on the left handrail.

As he started to reach down with his left foot for the first rung of the ladder, his foot hit ''something'' and he grabbed for the right handrail with his right hand. His hand slipped

off the rail because of the wet paint thereon and he fell off the ladder onto the main deck, 10 feet below.

We think it clear from the photographs introduced in evidence that the ''something'' which plaintiff hit with his left foot when he stepped on the top rung was the fuel pipe. At least it is reasonable to infer that that was what caused him to stumble and lose his balance. We think that this evidence must be viewed in this light when considering the propriety of the court's direction to the jury to return a verdict for defendant.

The danger of restricting the ''toe clearance'' of the top rung was testified to without objection by a welder leaderman employed by Todd. He testified that ''I almost fell off the ladder due to it [the pipe].'' And in *Smith* v. *United States*, 336 F.2d 165, 167, it was held that a restricted ''toe clearance'' on one of the rungs of a metal ladder leading from the deck down into one of the holds was insufficient and rendered the vessel unseaworthy.

The fact that the paint on the handrail was placed there by a Todd employee does not relieve Standard of responsibility therefor under the unseaworthy doctrine. The ladder which caused the accident in *Lawlor* was also placed there by Lawlor's fellow employees and the court held Socony-Vacuum liable for such unseaworthy condition.

The United States Supreme Court recently reiterated the well established rule that a shipowner is not relieved of liability under the unseaworthy doctrine even though the unseaworthy condition was caused by the plaintiff's employer. (*Italia Societa* v. *Oregon Stevedoring Co.,* 376 U.S. 315, 317 [84 S.Ct. 748, 11 L.Ed.2d 732].)

We have concluded that the evidence is sufficient to support a finding that the barge was in fact unseaworthy and that the jury should have been allowed to pass upon the issue.

The judgment is reversed and the cause is remanded to the lower court for further proceedings consistent with this decision.

Shoemaker, P. J., and Taylor, J., concurred.

A petition for a rehearing was denied February 17, 1965, and respondent's petition for a hearing by the Supreme Court was denied March 10, 1965.