Joseph **SKIBINSKI**, Plaintiff-Appellee,

v.

**WATERMAN STEAMSHIP CORPORATION**, Defendant-Appellant,

v.

**INTERNATIONAL TERMINAL OPERATING CO.**, Inc., Third-Party Defendant-Appellant.

No. 232, Docket 30065.

United States Court of Appeals Second Circuit.

Argued Jan. 25, 1966.

Decided March 31, 1966.

Friendly, Circuit Judge, dissented.

---

William A. Blank, Brooklyn, N. Y. (Wilfred L. Davis, New York City, and Robert Halper, Brooklyn, N. Y., on the brief), for appellee.

Joseph Arthur Cohen, New York City, (Sidney A. Schwartz, Alexander, Ash & Schwartz, New York City, of counsel), for appellants.

Before FRIENDLY and HAYS, Circuit Judges, and DOOLING, District Judge.*

HAYS, Circuit Judge:

We are here concerned with the question of liability for injuries suffered by plaintiff Skibinski, an employee of the International Terminal Operating Co., Inc., a stevedoring concern and the third-party defendant-appellant herein. When Skibinski was injured, he was working in the cargo hold of the defendant's ship *Madaket* from which Terminal was engaged in unloading a cargo of sugar. The issue is whether Skibinski's injury was caused by the unseaworthiness of the *Madaket*. We affirm the district court which held that the injury was caused by the ship's unseaworthiness.

There is evidence in the record to support the conclusion that the injury occurred in the following way:

Terminal, in order to facilitate the unloading operation, obtained permission to remove temporarily from the cargo hold a one ton steel ladder that was affixed to the ship's structure by welded steel brackets. Skibinski, a welder, was assigned to use his welding equipment to burn off the ladder and brackets. Three days later, the unloading operation having been completed, Skibinski, and a coworker named Stuve, returned to the vessel to reaffix the ladder, which was lying on the main deck.

Skibinski and Stuve first welded the brackets and then gave the word to lower the ladder. The ladder was to be lowered by three longshoremen, also in the employ of Terminal. Since there was inadequate space to permit the lowering of the ladder at the place it was to be reaffixed, the longshoremen devised a plan, which was described as follows:

"(1) lowering the ladder through the open middle section of the hatch; (2) laying it down flat on the bottom of the hold; (3) uncoupling the fastening mechanism by which it was lowered; (4) retrieving the fall; (5) lowering the fall again through the opening between the beams and the aft end of the hatch; (6) recoupling the fastening mechanism; (7) dragging the ladder to the aft end of the hold and lifting it into position."

---

* Of the Eastern District of New York, sitting by designation.

Skibinski v. Waterman Steamship Corporation, 242 F.Supp. 290, 294 (S.D.N.Y. 1965).

In order to lower the ladder through the hatch the longshoremen inserted an open mouth, "S" shaped cargo hook under the top rung of the ladder. Then, with one of the longshoremen operating the winch, the ladder was raised from the deck, positioned over the middle section of the hatch, and lowered. When the foot of the ladder reached the floor of the hold, the ladder disengaged itself from the hook, and rebounded against Skibinski, who, as the district court found, "was in the wings bending over his tools in preparation for his task."

The district court held that "[t]he use of the open mouth cargo hook and the falling ladder were proximate causes of plaintiff's injury."

■ Before reaching the principal issue itself, we must determine whether Skibinski was within the class protected by the warranty of seaworthiness. The resolution of this issue turns upon whether Skibinski was engaged in the type of work traditionally done by seamen. See, e. g., Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 412–413, 74 S.Ct. 202, 98 L.Ed. 143 (1953); Seas Shipping Co. v. Sieracki, 328 U.S. 85, 98–99, 66 S.Ct. 872, 90 L.Ed. 1099 (1946); Lawlor v. Socony-Vacuum Oil Company, 275 F.2d 599, 602, 84 A.L.R.2d 613 (2d Cir. 1960). In Pope & Talbot, Inc. v. Hawn, supra, 346 U.S. at 413, 74 S.Ct. at 207, where a shore based carpenter, employed by an independent contractor, was injured while repairing grain loading equipment, the Supreme Court held:

"* * * [L]egal protection was not based on the name 'stevedore' but on the type of work he did and its relationship to the ship and to the historic doctrine of seaworthiness. The ship on which Hawn was hurt was being loaded when the grain loading equipment developed a slight defect. Hawn was put to work on it so that the loading could go on at once. There he was hurt. His need for protection from unseaworthiness was neither more nor less than that of the stevedores then working with him on the ship or of seamen who had been or were about to go on a voyage. All were subjected to the same danger. All were entitled to like treatment under law."

See The Tungus v. Skovgaard, 358 U.S. 588, 595 n. 9, 79 S.Ct. 503, 3 L.Ed.2d 524 (1959).

Here, Skibinski had been working steadily repairing sugar ships for about four years prior to the accident. The work which he performed often required no welding at all. Wheeler, an expert witness, who was called by appellants, answered affirmatively the district court's question:

"As a matter of tradition and custom in the days prior to the advent of steel ladders welded to brackets on the ship's structure, would it have been the duty and function of a member of the vessel's crew to affix, remove or replace a ladder in the ship's hold, when necessary or desirable, in relation to loading or unloading operations?"

"That the owner seeks to have * * * [a traditional seamen's job] done with the advantages of more modern divisions of labor does not minimize the worker's hazard and should not nullify his protection." Seas Shipping Co. v. Sieracki, 328 U.S. 85, 96, 66 S.Ct. 872, 878, 90 L.Ed. 1099 (1946).

■ The district court was correct in finding that Skibinski was within the coverage of the warranty of seaworthiness.

On the issue of seaworthiness appellants argue that the "misuse of seaworthy equipment by plaintiff's co-workers in putting it to an unintended use, and their failure to properly use the proper equipment available to them and in their hands, falls without the ambit of the warranty of seaworthiness."

■ The open mouth hook used by the three riggers to lower the ladder into the hatch was unsuitable for the use to which it was put. Improper use of otherwise sound equipment may give rise to a condition of unseaworthiness. See Reid

v. Quebec Paper Sales & Transportation Company, 340 F.2d 34 (2d Cir. 1965); Grillea v. United States, 232 F.2d 919 (2d Cir. 1956). Unseaworthiness is not excused on the ground that it was caused by the acts of fellow servants. See Mahnich v. Southern S.S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 (1944); cf. Crumady v. The J. H. Fisser, 358 U.S. 423, 427, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959). Nor is it excused because proper equipment was available but went unused. See Mahnich v. Southern S.S. Co., supra; Strika v. Netherlands Ministry of Traffic, 185 F.2d 555, 556 (2d Cir. 1950).

■ This case also presents the question of whether the defect "should be considered as an incident in a continuous course of operation" and not as an unfitness of the ship. Grillea v. United States, 232 F.2d 919, 922 (2d Cir. 1956). In defining unseaworthiness we are not concerned with the conduct or process by which fitness is changed to unfitness. Our focus is upon the resulting condition of the ship. See Puddu v. Royal Netherlands Steamship Company, 303 F.2d 752, 757 (2d Cir.), cert. denied, 371 U.S. 840, 83 S.Ct. 67, 9 L.Ed.2d 75 (1962) (Hays, J., concurring).

Here, the longshoremen, by improperly using an open mouth hook, fashioned an apparatus which was patently unsuitable for the job to which it was put. The use of this apparatus took a substantial amount of time, so that the apparatus became part of the *Madaket's* equipment. See Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1962).

Recently, in Reid v. Quebec Paper Sales & Transportation Company, 340 F.2d 34, 35 (2d Cir. 1965), where a portable ladder was left unsecured, we said:

"Under the circumstances it was necessary for the ladder to be secured in some fashion when it was being used, and unless it was so secured, it was unfit for its intended use. An unsecured and dangling ladder under the conditions existing at the time of the accident posed a serious threat to the safety of those standing below in the hold, regardless of whether the shipowner knew it was unsecured and regardless of how quickly this threat materialized."

See Strika v. Netherlands Ministry of Traffic, supra; Grillea v. United States, supra.

Massa v. C. A. Venezuelan Navigacion 332 F.2d 779 (2d Cir. 1964); Spinelli v. Isthmian S.S. Co., 326 F.2d 870 (2d Cir.), cert. denied, 377 U.S. 935, 84 S.Ct. 1338, 12 L.Ed.2d 298 (1964) and Puddu v. Royal Netherlands S.S. Co., 303 F.2d 752 (2d Cir.), cert. denied, 371 U.S. 840, 83 S.Ct. 67, 9 L.Ed.2d 75 (1962), are all distinguishable since they were thought to involve transitory situations which had not yet ripened into unseaworthiness. Each arose "as a momentary step or phase in the progress of work on board," and was "considered as an incident in a continuous course of operation." Grillea v. United States, supra, 232 F.2d at 922.

■ On the basis of the evidence before it the trial court was justified in holding that Skibinski's injury resulted from the unseaworthiness of the ship.

■ Appellants claim that Skibinski was contributorily negligent because at the time of the accident he was beneath the center of the hatch with his hands grasping the descending ladder. The argument is predicated upon the testimony of Stuve, Skibinski's co-worker, and inferences to be drawn from the location of appellee's injuries. Skibinski contends that he was against the skin of the ship, with his back to the space beneath the center of the hatch, and was bending over picking up tools, when the ladder crashed to the floor and rebounded against him. Thus the testimony at the trial was contradictory. Appellee's medical witness could not "reconstruct from * * * [Skibinski's] injuries the exact manner in which the trauma occurred." The district court "paid particular attention to the demeanor of the witnesses," and found that "from a quantitative and qualitative viewpoint based upon the entire record * * * [appellants] have failed to sustain their burden of proof,

by a preponderance of the evidence, that plaintiff was contributorily negligent." We cannot say that this finding is clearly erroneous.

Affirmed.

FRIENDLY, Circuit Judge (dissenting):

This case, like others that come to us in increasing numbers, falls between two reasonably plain lines of authority. If a ship has equipment safe for a task, and only that, she is not rendered unseaworthy by a seaman's failure to use what has been provided for him. Ezekiel v. Volusia S.S. Co., 297 F.2d 215, 91 A.L.R.2d 1013 (2 Cir. 1961), cert. denied, Pinto v. States Marine Corp., 369 U.S. 843, 82 S.Ct. 874, 7 L.Ed.2d 847 (1962); Guarracino v. Luckenbach S.S. Co., 333 F.2d 646 (2 Cir.), cert. denied, 379 U.S. 946, 85 S.Ct. 439, 13 L.Ed.2d 543 (1964). On the other hand, if a seaman is injured by use of unsafe equipment, e. g., a rope with a latent defect, the ship cannot escape liability for unseaworthiness because safe equipment also was available. Mahnich v. Southern S.S. Co., 321 U.S. 96, 103–104, 64 S.Ct. 455, 88 L.Ed. 561 (1944). Here the lifting gear the ship turned over to the stevedore was entirely sound; every piece of it was staunch, solid and suited to its intended use. Plaintiff's injury resulted solely from the negligent manner in which the stevedores employed it.

The problem whether a ship becomes unseaworthy when stevedores put safe equipment to improper use was first presented to this court in Strika v. Netherlands Ministry of Traffic, 185 F.2d 555, 556 (2 Cir. 1950), cert. denied, 341 U.S. 904, 71 S.Ct. 614, 95 L.Ed. 1343. (1951). Judge Learned Hand decided it in favor of the plaintiff rather cavalierly, saying, "In answer we need only cite Mahnich v. Southern S.S. Co." Later, evidently realizing that *Mahnich* was not truly dispositive and the question thus not so easily dispatched, he engaged in further elaboration: although it "would be futile

to try to draw any line between situations in which the defect is only an incident in a continuous operation, and those in which some intermediate step is to be taken as making the ship unseaworthy," the two situations must nevertheless be separated on the particular circumstances of each case. Grillea v. United States, 232 F.2d 919, 922 (2 Cir. 1956). Judge Swan dissented in both cases, insisting in *Grillea* that "[t]he long recognized distinction between injuries caused by unseaworthy gear and injuries caused by improper use of proper gear" had not been "completely wiped out" by Supreme Court decisions. 232 F.2d at 924.

Our efforts to carry out Judge Hand's mandate in *Grillea*, a principle which my brother Hays has characterized as "far from satisfactory," Puddu v. Royal Netherlands S.S. Co., 303 F.2d 752, 757 (2 Cir. 1962), have been wholly unsuccessful—perhaps because we have not correctly apprehended just what Judge Hand meant. I cannot see, for example, what meaningful distinction my brothers find between this case and Massa v. C. A. Venezuelan Navigacion, 332 F.2d 779 (2 Cir.), cert. denied, 379 U.S. 914, 85 S.Ct. 262, 13 L.Ed.2d 186 (1964); a rig in which one metal bar is connected with a top pallet and another with the bottom pallet seems just as unseaworthy to me as one in which a ladder is suspended on an open hook. But neither can I see any satisfactory distinction between *Massa* where the stevedore lost and *Strika* where he won. If the test is a temporal one, a more accurate stopwatch than I possess would be needed to explain why Reid v. Quebec Paper Sales & Transp. Co., 340 F.2d 34 (2 Cir. 1965), should have gone one way and Puddu v. Royal Netherlands S.S. Co., 303 F.2d 752 (2 Cir.), cert. denied, 371 U.S. 840, 83 S.Ct. 67, 9 L.Ed.2d 75 (1962), and Spinelli v. Isthmian S.S. Co., 326 F.2d 870 (2 Cir.), cert. denied, 377 U.S. 935, 84 S.Ct. 1338, 12 L.Ed.2d 298 (1964), the other.[1] What

1. The hypothetical case put in *Grillea*, 232 F.2d at 922, where longshoremen had left the ship in an unseaworthy condition and

were injured on their return the next day, would rest on an intelligible distinction.

is more important, taking all six cases— *Strika, Grillea, Reid, Puddu, Spinelli,* and *Massa*—the first three going for the plaintiff and the last three for the ship, I fail to see any meaningful difference either in the ship's performance or the plaintiff's deserts.

It is time to scuttle a doctrine which requires judges to make distasteful hair-splitting distinctions unrelated to any intelligible concepts of right and wrong; granted that liability for unseaworthiness does not rest on fault, it ought to rest on something more than casuistry. Indeed, I suspect we would long since have revolted against a principle which capriciously imposes liability on a thoroughly well equipped ship if we did not know that in the usual case, where the plaintiff "seaman" is shore-based, the story will have a happy ending for the ship since liability will rest on her only for a moment and then will be transferred to the stevedoring contractor. By very definition, improper use of ship's equipment triggers the contractor's warranty of workmanlike service, Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956), the ship regularly impleads the stevedore, and there the burden falls. To me this argues for a restrictive rather than an expansive notion of unseaworthiness in these situations; courts should not strain to use the ship, innocent in every realistic sense, merely as a conduit for imposing on the negligent employer a liability to his employees differing from the absolute but limited one which Congress made exclusive by § 5 of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 905. Of course the statute did not impair an injured longshoreman's right against third parties who have wronged him, 33 U.S.C. § 933. But proper respect for what Congress was "driving at," see Johnson v. United States,

163 F. 30, 32, 18 L.R.A.,N.S., 1194 (1 Cir. 1908) (Holmes, J.), ought to lead judges away from a doctrine which so frustrates the legislative purpose by imposing a transitory liability on a third party that has turned over a thoroughly seaworthy vessel to a qualified stevedore. If the benefits under the Compensation Act are inadequate, the remedy lies in action by Congress, not in judicial legerdemain which helps one longshoreman but does nothing for another whose situation would appear similar to everyone except those lawyers and judges who have had to accustom themselves to the witty diversities of this branch of the law.

My view necessarily rests on the assumption, which I believe to be sound, that the issue has not been settled otherwise by the Supreme Court. Although the Court has indeed expanded the notion and the coverage of unseaworthiness, it has not yet dealt with the problem of a momentarily unsafe condition created solely by negligence of stevedores in the course of their work; in the one instance in which it cited this aspect of the *Grillea* decision, the Supreme Court did not endorse this court's holding, declaring that it "need not go so far" since the winch had been "adjusted by those acting for the vessel owner in a way that made it unsafe and dangerous for the work at hand." Crumady v. The J. H. Fisser, 358 U.S. 423, 427, 79 S.Ct. 445, 448, 3 L.Ed.2d 413 (1959). The *Strika* decision was approved in Gutierrez v. Waterman S.S. Corp., 373 U.S. 206, 215, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963), but only in its holding that a ship was liable for effects of unseaworthiness realized on shore. And while I recognize that Morales v. City of Galveston, 370 U.S. 165, 82 S.Ct. 1226, 8 L.Ed. 2d 412 (1962) is distinguishable, it at least shows that a condition created in loading a vessel can be too momentary to render her unseaworthy.