**Frank C. GUENARD, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 7702.**

United States District Court
E. D. Louisiana,
New Orleans Division.

Jan. 9, 1968.

---

Theodore A. Mars, Jr., New Orleans, for plaintiff.

Robert Acomb, Jr., New Orleans, for Todd Shipyards Co., Inc. and for the United States.

RUBIN, District Judge:

Frank C. Guenard, a shipyard employee, was injured while working aboard a vessel, the U.S.N.S. TALLULAH, which was in the shipyard for repairs. Guenard's injuries left him completely incapacitated. He sued the owner of the vessel on the ground that the vessel was unseaworthy and on the further ground of negligence.

The defendant filed a motion for summary judgment based in part on the contention that the vessel was not in navigation. The Court denied the motion for summary judgment but severed the issue whether the vessel was in navigation on the date of the accident sued on and heard evidence on that issue. The Court's findings of fact are:

In 1963, the occurrence of the Berlin crisis created the possibility of a military mobilization. The U.S.N.S. TALLU-LAH, a fuel tanker, was in navigation and seaworthy. However, the United States decided to have a major overhaul made to THE TALLULAH and to have the vessel improved concurrently with its regular annual overhaul.

THE TALLULAH was being operated by Keystone Shipping Company. Plans and specifications for the repairs were prepared and a base bid was received from Todd Shipyards in the amount of $561,276.00. While the vessel was in the yard, however, various modifications to the contract were negotiated, and the final cost of the repairs to the vessel was $800,379.08. This amounted to a virtual rebuilding of the vessel.

THE TALLULAH sailed to New Orleans under her own power. It was delivered to Todd on September 2, 1963, and was placed in dry dock on September 9, 1963. It was removed from dry dock on October 1, 1963, and was moved by tug to a dock at the shipyard where it remained while work on the vessel continued. The movement from the dry dock occurred at night and the ship's officers were aboard at the time. The vessel was delivered to Keystone, as agent for the United States, on November 14, 1963.

The work done to the vessel included deck, machinery and hull repairs and improvements. The engines and motors were all opened, inspected, and necessary repairs and replacements were made. Most of the work during this overhaul could not have been performed by the ship's crew and was not of the kind the crew normally would undertake. Todd's personnel had complete responsibility and control over the way in which the repairs were to be done, and they were not under the supervision of the master or officers of the vessel although these persons were present to be certain that the owner got its money's worth.

Guenard was injured on October 16, 1963. At that time the vessel was afloat, but was tied up at a pier in Todd's Shipyards. There was no power aboard the vessel, and all electricity was furnished from transformers on Todd's pier. The vessel could neither have furnished its own power nor sailed since its machinery had been taken apart and work was in

progress on its pumps, generators, and the condensers for the boilers. The crew's quarters were being renovated and were not habitable. Various portions of the ship's piping had been removed for repairs. It would have been impossible for the ship to leave the dock under her own power substantially earlier than she did in fact sail.

When THE TALLULAH is at sea, she carries a full crew. When she arrived in New Orleans, the crew was signed off, but the master, the chief mate, the third mate, the chief engineer, and the first and second assistant engineers were kept on the payroll. They lived ashore but reported to work aboard the vessel. Their assignment was to observe the repairs and report any failure by Todd to do its work in accordance with its contract. They kept a log covering the entire period, and the vessel was not de-certified. However, while the repairs were being made, THE TALLULAH was under Todd's control and Todd determined what work was to be done, in what manner it was to be done, and who would do it. The fact that when the vessel was moved the master was requested to be aboard is to me an indication that the vessel was at all other times under the full control of Todd.

The operating agreement between Keystone and the United States provided that the vessel would at all times be classified in one of the status categories listed in the agreement. The basic categories were Full Operations Status (FOS) and Reduced Operations Status (ROS). The FOS category included a classification FOSB, defined as "a major repair period; a major repair with the period of repairs of sufficient duration to warrant a substantial reduction in crew. Normally this would include the regular scheduled annual overhaul of the ship." The government's classification of the vessel as being on FOSB status is consistent with its being withdrawn from navigation, and the mere fact that the same classfication would be used for annual overhaul does not mean that all vessels thus classified should be considered as in the same status with respect to the owner's duty to provide a seaworthy vessel.

Judge Medina's lucid opinion in Lawlor v. Socony-Vacuum Oil Co., 2 Cir., 1960, 275 F.2d 599, provides a comprehensive review of the jurisprudence on the question whether a vessel is "out of navigation." This is no talismanic term but a concept of status developed to determine when the owner of a vessel had a duty to provide a seaworthy vessel and when that duty ceased by virtue of the fact that the vessel was not being used as a ship in any traditional sense. As Judge Medina observed in *Lawlor*, "[I]f being 'out of navigation' is a material factor, everything depends upon what we mean by 'out of navigation' in the context of the doctrine of unseaworthiness." And he concluded that the controlling factors when a vessel is put in a shipyard for repairs are "the character of the work to be done by the shipyard, the presence or absence of a crew performing the customary work of seamen on shipboard, and the consequent measure of control or lack of control by the shipyard over the vessel as a whole * * *."

In deciding that the vessel there involved was not out of navigation the opinion pointed out that it was in the shipyard only 8 days; the total cost of the work was $70,834; the work did not involve "extensive repairs amounting virtually to the reconstruction and rebuilding of the vessel" and it involved "nothing in the category of major repairs or structural and extensive changes in the vessel, but only a large number of relatively small miscellaneous items such as are generally included in an annual overhaul." The shipowner had general control of the vessel and a full crew of officers and men were aboard.

If we set the U.S.N.S. TALLULAH as it floated in Todd Shipyards in October, 1963 alongside the vessel thus described in *Lawlor*, we have a full picture why THE TALLULAH was then in so different a status from the vessel dealt with in *Lawlor* as to require THE TALLULAH to be considered "out of naviga-

tion" and hence to relieve its owner of the warranty of seaworthiness to shipyard workers aboard it. Here the repairs required 83 days (not 8); they involved major structural alterations (not only items usually encompassed by the annual overhaul); they cost $800,000 (not $70,000); and the crew was not even aboard—to mention but a few salient points of difference.

The *Lawlor* decision is a logical application of the principles set forth in West v. United States, 1959, 361 U.S. 118, 80 S.Ct. 189, 4 L.Ed.2d 161. While the vessel involved there had been totally deactivated and was being overhauled preparatory to resuming operations, the Court's opinion does not rest on the idea that the vessel had been in the "mothball fleet," as counsel suggests. The more important factors were that the contractor had complete responsibility and control of the making of the repairs; the ship's officers on board signed no shipping articles and had no control of the ship and, as the court observed, she "was not in maritime service," for

> "She was undergoing major repairs and complete renovation, as the petitioner knew. Furthermore, he took his orders from the contractor, not the shipowner. He knew who was in control. This undertaking was not 'ship's work' but a complete overhaul of such nature, magnitude, and importance as to require the vessel to be turned over to a ship repair contractor and docked at its pier for the sole purpose of making her seaworthy. It would be an unfair contradiction to say that the owner held the vessel out as seaworthy in such a case. It would appear that the focus should be upon the status of the ship, the pattern of the repairs, and the extensive nature of the work contracted to be done, rather than the specific type of work that each of the numerous shore-based workmen is doing on shipboard at the moment of injury." [1]

Judge Eggleston of the United States District Court for the Southern District of New York recently dealt with issues remarkably similar to those here involved in La Franca v. United States, 1965 A.M. C. 2019. The vessel there involved was undergoing a major overhaul costing approximately $800,000. The work required 12 weeks. There, however, the Navy continued to berth approximately ⅔ of the ship's regular crew on board the vessel. The only significant difference is that the vessel was towed to the shipyard and did not arrive under her own power as the U.S.N.S. TALLULAH did here. The ship, it was there held, "had been effectively removed from navigation during the period of this major overhaul, and was a dead ship." This is in accord with the result in Moon v. United States, E.D.N.Y., 1960, 197 F.Supp. 406, where the vessel had been in service, then had been put in dry dock for several months for major repairs. See also Union Carbide v. Goett, 4 Cir., 1958, 256 F.2d 449, decided before the *West* case (but reaffirmed later, 278 F.2d 319).

Plaintiff's reliance on Hercules Co. v. S.S. B. G. Absolom Baird, 214 F.2d 66, is misplaced for the only issue there was whether the vessel was subject to a maritime lien for repairs furnished to put her in readiness for a voyage.

The Fifth Circuit Court of Appeals recently dealt with a Jones Act claim in Bodden v. Coordinated Carribean Transport, Inc., 5 Cir., 1966, 369 F.2d 273. The Court there held that whether the vessel was in navigation at the time the plaintiff was injured and thus whether he was a seaman under the Jones Act was a fact question to be decided by the jury. Here this Court as trier of fact has heard all of the evidence on the issue. There is only one conclusion that can logically be reached. The vessel was under the control of Todd Shipyards; by all the pertinent principles it was out of navigation; and the owner therefore owed Guenard no warranty of seaworthiness.

1. Roper v. United States, 1961, 368 U.S. 20, 82 S.Ct. 5, 7 L.Ed. 1, does not appear pertinent. There a vessel was deactivated and was being used for grain storage. The Court found that it was never put back in navigational status.

Accordingly, counsel for defendant will prepare a proposed form of judgment on this issue, and submit it to opposing counsel and the Court. Counsel for the plaintiff shall notify the Court within three (3) days after receipt of the form of judgment if it has any objection to the form. No opinion is expressed on the issue raised by the plea of negligence.