**Giuseppe ROSA, Plaintiff,**

v.

**A/S D/S SVENDBORG, Defendant.**

**No. 64 AD 831.**

United States District Court
S. D. New York.

Oct. 3, 1968.

Muscio, Camarda & Scibilia, Brooklyn, N. Y., for plaintiff.

Mendes & Mount, New York City, for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

MOTLEY, District Judge.

Plaintiff is a longshoreman who in April 1961 was employed by Universal Terminal & Stevedoring Corporation. Plaintiff's employer had a contract with the owner of the defendant vessel, the A/S D/S Svendborg to unload cargo from the ship's hold at a pier in Brooklyn, New York, on April 26, 1961. At approximately 8:30 A.M. on that date, plaintiff and other members of his gang descended the number two hatch and commenced unloading coffee which had been stowed in that hold. The hatch had been covered by six wooden hatch covers. Each cover was eight feet long,

one and a half feet wide, and "three fingers thick". There was a thick metal stripping around the edges of each hatch cover. Iron handles also were attached to each cover to facilitate lifting.

When plaintiff and his fellow employees came aboard ship at 8:00 A.M., their first task was to remove the hatch covers and place them on deck. Finding space on deck for the hatch covers was a problem. There had been stowed on deck alongside hatch number two other cargo, i. e., huge tree trunks. They had been stowed on deck at a port prior to the Port of New York. These logs occupied all of the space between the hatch coaming and the railing of the ship on the inshore side. The longshoreman, consequently, placed the covers in a space on the deck at the aft end of the hatch. This was a space just large enough to accommodate three of the covers, placed one on top of the other, on the inshore side and three on the offshore side.

The tree trunks were to be unloaded at a port subsequent to the Port of New York. They had not been covered in any way and had been exposed to the weather, including rain, for several days prior to April 26, 1961. These tree trunks were so large in circumference that, although the hatch coaming extended above the deck several feet, the trunks extended above the hatch coaming by at least a foot. The hatch coaming is an iron structure which forms the perimeter of the hatch and is approximately four or five feet above the main deck.

The placement of the tree trunks on the deck between the hatch coaming and the railing made it impossible for the signalman to walk on the deck between the hatch and the railing in the performance of his duties with relation to the winch operator, the men in the hold and the men on the dock. No catwalk had been constructed over this deck cargo as is the practice under such circumstances. Consequently, the longshoremen decided to improvise. Several of the 120 pound hatch covers were placed across the tree trunks by the signalman and other deckmen in lieu of the customary catwalk.

Since these hatch covers had not been secured in any way, they created a particularly hazardous condition with relation to the men working in the open number two hatch.

This hazard was exacerbated in this case by the fact that the winch operator, in operating the Burton winch, was required to cause the cargo sling to transverse the unsecured hatch covers in returning the empty sling to the hold. The sling was attached to the cargo hook. Each time the winch operator returned this wire sling from the dock, which he was forced to bring in very low, the empty sling touched the tree trunks. The necessity for the low return of the sling resulted from the fact that the sling when empty did not have sufficient weight to cause the Burton fall to descend properly into the hold. Therefore, the winch operator was obliged to bring the sling in low so as to facilitate the descent of the fall into the hold. If he did not bring in the sling low, it would remain dangling in the air due to the fact that the winches on this vessel were somewhat old and the worn rope in the block would get stuck. On one or two occasions when the sling remained suspended, the signalman walked on the hatch covers on top of the tree trunks and grabbed the fall with his hands and assisted its return to the hatch. It was during the course of operating the winch under the foregoing conditions that the sling on one occasion caught on one of the hatch covers and caused it to slip and fall into the hold where plaintiff was working.[1]

Plaintiff was struck on the head by the falling hatch cover, rendered unconscious, and removed in that state to a hospital in Brooklyn. Plaintiff re-

---

[1]. The winch operator had returned the empty sling to the hold about ten times before the accident occurred. The un-

loading started about 8:30 A.M. and the accident occurred about 20 minutes later.

mained in the hospital from April 26, 1961 to May 20, 1961.

As a result of the accident, plaintiff suffered a moderately severe cerebral concussion. He had a small laceration, ½ centimeter, at the vertex of the scalp. Although there was tenderness of the scalp, there was no fracture and no subdural hematoma. He also suffered a contusion of the left side of the skull. He sustained a contusion and sprain of the right shoulder and the cervical region (neck). He suffered the effects of the concussion which are referred to medically as a post concussion syndrome, i. e., amnesia as to events surrounding the accident, headaches, dizziness, and an unsteady gait. The latter symptoms were noted in the hospital record. The injury to plaintiff's right shoulder has left him with a permanent defect. He also has continued to have intermittent headaches and dizziness (resulting from a disturbance of the balancing mechanism of the ears) which are permanent residuals of the cerebral concussion which he suffered. Plaintiff also sustained a slight hearing loss which is not disabling as far as his work as a longshoreman is concerned.

After his discharge from the hospital, plaintiff continued to receive treatment for the injury to his neck and shoulder. He did not return to work until November 27, 1961. When he returned to work, he was assigned somewhat lighter duties on the dock for about a year, without any diminution in pay, before returning to the hold. Upon returning to the hold, he was assisted in performing his share of the work whenever he felt badly by his co-workers. Plaintiff also restricted himself to working largely with his own gang after returning to work. He did not take outside jobs when he did not feel well. He has lost some time from work since his return due to pain in his shoulder, headaches and dizziness.

From the period April 26, 1961 to November 27, 1961, plaintiff lost $3,150.00 in wages. Since his return to work, plaintiff has lost time from work due to his injuries, although the exact number of days and the amount of lost wages involved was not proved. Plaintiff incurred medical expenses totaling $1,139.-05. Plaintiff was 51 years old at the time of the accident.

In sum, the court finds: 1) the placement of the unsecured hatch covers on the wet tree trunks by the signalman and deckmen in order to provide the signalman with a place to walk in lieu of constructing a catwalk over the deck cargo created an unseaworthy condition with respect to the men working in the open hatch below; 2) the vessel was unseaworthy as a result of the fact that the Burton winch was old and not functioning properly and, as a result, the winch operator was forced to operate the winch in a negligent fashion with respect to the hazard created by the unsecured hatch covers; 3) plaintiff was injured as a result of these unseaworthy conditions; 4) plaintiff suffered the injuries described when a 120 pound hatch cover was accidentally knocked into the hatch by the winch operator; 5) as a result of his injuries plaintiff has a permanent derangement of his right shoulder and permanent residuals of the moderately severe cerebral concussion which he sustained; i. e., intermittent headaches and dizziness; 6) plaintiff has endured pain and suffering in the past and will endure pain and suffering in the future; 7) plaintiff's lost wages amount to $3,-150.00 and his medical expenses total $1,139.05. The court does not find that plaintiff was contributorily negligent as contended by defendant.[2]

Defendant is liable to plaintiff for the injuries and damages which he has sustained as a result of the unseaworthiness of the vessel, even though plaintiff was the employee of an inde-

---

2. Defendant contended: 1) that plaintiff participated in placing the hatch covers on the logs, and 2) that plaintiff was working in the square of the hold contrary to orders. Neither contention was proved.

pendent stevedoring contractor, Seas Shipping Co., Inc. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), and the unseaworthiness arose not only from old and improperly functioning ship's gear, Alaska S.S. Co. v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798 (1954), but from the misuse of seaworthy hatch covers by plaintiff's fellow employees, Skibinski v. Waterman Steamship Corp., 360 F.2d 539 (2d Cir. 1966), cert. denied, 387 U.S. 921, 87 S.Ct. 2027, 18 L.Ed.2d 975 (1967), and what once might have been designated the operational negligence of the winch operator. Candiano v. Moore-McCormack Lines, Inc., 382 F.2d 961 (2d Cir. 1967), reh. den. 386 F.2d 444 (1967), cert. denied, 390 U.S. 1027, 88 S.Ct. 1416, 20 L.Ed.2d 284 (1968); Alexander v. Bethlehem Steel Corp., 382 F.2d 963 (2d Cir. 1967).

■ In addition to his lost earnings of $3,150.00 and $1,139.05 in medical bills, plaintiff is awarded $17,491.07 for diminished earning capacity and $4,-000.00 for pain and suffering, past and future.[3]

Settle order on notice.

3. The court arrived at the figure for loss of earning capacity in the future by using the principles set forth in Conte v. Flota Mercante del Estado, 277 F.2d 664 (2d Cir. 1960), and in LeRoy v. Sabena Belgian World Airlines, 344 F.2d 266 (2d Cir. 1965), as a guide. Accordingly, the court took into consideration the following:

The evidence disclosed that in 1960, just prior to the accident, plaintiff earned $5,353.89. He has earned more than this amount in each year since his return to work although his earnings have not been progressively more each year. There have been fluctuations. In 1967, for example, plaintiff earned approximately $7,000, whereas a fellow employee, Denaro, earned $8,400. In 1966, plaintiff earned $8,-175.71 and Denaro earned approximately $10,000.

In arriving at a determination of the per cent of decrease in plaintiff's earning capacity, the court chose the 1967 differential, the lower of the two differentials, since 1967 is the year preceding the entry of judgment. Since this $1,400 differential represents a 16⅔% loss in income, the court concluded that plaintiff has suffered a 16⅔% loss in earning capacity. The court, of course, cannot predict what plaintiff's future earnings or the differential between his earnings and those of his fellow employee will be. There are simply too many unpredictable factors to consider in making any such prediction, e. g., the effect of union negotiations, inflation, unemployment, strikes. The court, therefore, feels that it is equitable to use the figure $1,400 as a fair estimate of the yearly dollar value of a 16⅔% loss of earnings past and future. Using the $1,400 figure, the court has computed the interest thereon, compounded at 4% for each year from April 1962 to April 1968, the result being $9,676.27. Although plaintiff's life expectancy is age 73, the court, in arriving at the amount of plaintiff's future lost earnings, has taken into consideration the fact that persons in plaintiff's line of work, usually, by- virtue of union contract provisions and Social Security payment provisions, retire at age 65. The court, therefore, again using the figure $1,400 per year from April 1968 to April 1975, at which time plaintiff would reach the age of 65, discounted at 6% this total of future lost earnings to its present value of $7,814.80. The 6% discount rate selected corresponds with current discount rates.

The figure of $4,000 for pain and suffering is based on the fact that it does not appear that future pain and suffering will be extremely great.