Joaquim CONCEICAO,
Plaintiff-Appellee,

v.

NEW JERSEY EXPORT MARINE CARPENTERS, INC., Defendant and Third-Party Plaintiff-Appellee.

Cia. De Nav. Mar. NETUMAR, Defendant and Third-Party Plaintiff-Appellant,

v.

INTERNATIONAL TERMINAL OPER-ATING CO., INC., Third-Party Defendant-Appellee.

No. 66, Docket 74–1344.

United States Court of Appeals, Second Circuit.

Argued Nov. 14, 1974.

Decided Dec. 11, 1974.

Certiorari Denied April 28, 1975.

See 95 S.Ct. 1680.

George J. Duffy, Hoboken, N. J. (Baker, Garber, Duffy & Baker, Hoboken, N. J., on the brief), for plaintiff-appellee.

William F. Larkin, New York City (Larkin, Wrenn & Cumisky, New York City, of counsel to Coppola & D'Onofrio, New York City, on the brief), for defendant and third-party plaintiff-appellee.

Victor S. Cichanowicz, New York City (Cichanowicz & Callan, New York City, on the brief), for defendant and third-party plaintiff-appellant.

Albert V. Testa, New York City (Sidney A. Schwartz and Alexander, Ash, Schwartz & Cohen, New York City, on the brief), for third-party defendant-appellee.

Before MEDINA, FRIENDLY and GURFEIN, Circuit Judges.

MEDINA, Circuit Judge:

The SS Mosqueiro sailed from Pier 36, East River, New York City on her overseas voyage on November 5, 1970. That morning the task of loading and stowage was nearing completion and the parties to this appeal were performing or failing to perform their respective functions in connection with the removal from a lighter, moored to the offshore or port side of the vessel, of a large quantity of huge steel pipes and stowing them on the forward weather deck of the vessel. In connection with this loading and stowing operation, one of the pipes was dislodged and rolled over the foot of the plaintiff, a longshoreman, causing the injuries on account of which the jury awarded him $42,000 damages.

There is no satisfactory proof in the record of the exact number of pipes actually lifted from the lighter and stowed on the forward deck of the vessel. But, as we shall see, the number of pipes was large. They were 30 to 40 feet long, about 18 inches in diameter and each weighed considerably more than a ton. Speaking in broad terms the functions of the parties to this appeal, in connection with the operation of removing the pipes from the lighter and stowing them on the forward weather deck of the vessel were: (1) it was the obvious duty of the shipowner, Cia. De Nav. Mar. Netumar, to decide where and how the pipes were to be stowed; (2) in connection with the stowage in a place where, during the voyage, heavy seas might be encountered, orders were given on behalf of the shipowner to New Jersey Export Marine Carpenters, Inc. (The Carpenters), to build cribs, crates or wooden pipe beds into which the pipes could be lowered and stowed by the winchmen and the longshoremen, and two of these wooden pipe beds were built; (3) the actual loading and stowing were done by longshoremen such as Conceicao employed by the stevedore, International Terminal Operating Co., Inc. (ITO). These longshoremen in the employ of ITO included the winchmen, the hatch boss and, in this case, 8 longshoremen, including the plaintiff, who were stationed on top of the hatch covers at hatch No. 1 to guide the drafts into place in this pipe bed on the starboard or inshore side of the hatch.

Conceicao sued the shipowner, claiming that the unseaworthiness of the vessel and the negligence of the shipowner were proximate causes of the accident, and The Carpenters, claiming that a breach by The Carpenters of its implied warranty of workmanlike performance was a proximate cause of the accident. Each of these cross-claimed against the other, and they also asserted a claim against ITO as a third-party defendant.

The case was tried to Judge Ward and a jury. In answer to written interrogatories the jury found:

(1) That the vessel was not unseaworthy but that the shipowner was guilty of negligence that was a proximate cause of the accident, thus establishing plaintiff's claim against the shipowner, exonerating plaintiff of any contributory negligence and fixing the damages at $42,000.

(2) That The Carpenters had not breached any warranty of workmanlike performance that it owed plaintiff, thus finding no liability on the part of The Carpenters for improperly constructing the pipe bed.

(3) That ITO had breached its warranty of workmanlike performance of the stevedoring operation and that this breach was a proximate cause of the accident, but that the conduct of the shipowner had been such as to prevent the shipowner from recovering indemnity from ITO on the claim against ITO as third-party defendant. In terms of the instructions to the jury this meant that indemnity was denied because the jury found that the shipowner "by some action or inaction * * * prevented, hindered or seriously handicapped ITO in performing its workmanlike job."

The result of these findings was a judgment in favor of Conceicao and against Netumar for the amount of damages fixed by the jury. The claims and cross-claims against The Carpenters and ITO were dismissed. The trial judge on December 10, 1973 filed an unreported opinion denying the shipowner's motion to set aside the verdict and for judgment in its favor either dismissing the complaint or granting it indemnity against ITO or in the alternative for a new trial. The shipowner appeals. There is also a protective appeal by Conceicao.

*I*

*How the Accident Happened and the Issues on This Appeal*

There was evidence from which the jury was justified in concluding that on the morning of November 5, 1970 there was a lighter on the port or offshore side of the Mosqueiro and on this lighter were the heavy pipes to be loaded and stowed on the vessel. Alongside the port and starboard No. 1 hatches, which were those nearest to the bow of the vessel, The Carpenters had constructed two wooden pipe beds or cribs. In loading the starboard or inshore crib the pipes were lifted, two at a time, from the lighter, swung across the No. 1 hatches and guided by the longshoremen, who were standing on the closed and battened down hatch covers of the starboard hatch No. 1, to a position just over the pipe crib. Then the two pipes were lowered gently into the crib. As soon as the pipes were in place, a longshoreman at both the bow and stern end of the pipe would step forward from his position on the hatch covers and release the hooks holding the pipes.

There was ample testimony concerning the proper manner of building a pipe crib and concerning the manner of building this particular crib. It was made of new lumber with a number of whalers at the bottom and sturdy uprights about five feet high at intervals of five feet. The whole affair was tightly wedged against the steel coaming of the hatch on one side and similarly wedged against the rail of the vessel on the other.

The testimony of plaintiff and others was to the effect that the draft of two pipes was gently lowered to a place about the center of the stow of pipes, that he stepped forward to release the hook at his forward end of the pipes when one or more of the uprights broke apart, "the pipes moved" and his foot was crushed. This was the last draft loaded into the starboard crib. The very considerable number of remaining pipes was not placed in any crib but was stowed athwartship over the port and starboard No. 1 hatch covers. Before this draft pipes had been stowed to the top of the uprights and there is some testimony to the effect that pipes had been loaded to a point well above the tops of the uprights. There is expert testimony that this was bad practice. In any event, one or as many as three of the uprights broke apart and, as the

pipes in the stow shifted, one of them caught Conceicao's foot. Only the forward end of the stow shifted, as the after end of the load of pipes rested against the deckhouse on which the winches and the winchmen were located.

■ We think it too clear for extended discussion that the jury had before it proof to justify a finding that the pipe crib was in every respect properly built by The Carpenters and that the findings that the vessel was seaworthy and that The Carpenters had not breached their implied warranty of workmanlike performance must stand. The pipe crib was fit for the purpose for which it was intended to be used. We also think the evidence justified a finding by the jury that a stevedore with expertise and special competence in the loading and stowage of vessels, including the filling of pipe cribs, should know enough not to overload a pipe bed and cause some of the uprights to break off and dislodge some of the pipes. Findings that ITO had breached its warranty of workmanlike performance and that this breach was a proximate cause of plaintiff's accident are supported by sufficient evidence.

The substantial questions on the appeal concern the finding of negligence on the part of the shipowner and the additional finding that the shipowner had acted or failed to act in such a manner as to defeat the shipowner's claim for indemnity against ITO.

## II

### The Shipowner Was at Fault in Many Respects

■ The deposition of the shipowner's Port Captain, Richard A. Piper, was read at the trial. It was his job to lay out the stowage of all outbound cargo and to supervise the loading in conjunction with the Master and Chief Officer of the vessel. What the jury could have found was that, although Piper knew the exact quantity of pipes to be loaded and already had decided that three pipe beds were necessary, two at No. 1 hatch and another at No. 2 hatch, as is clearly shown on the Stowage Plan that was received in evidence as Plaintiff's Exhibit 4, he did not show the Stowage Plan to William Montella, the foreman of The Carpenters, nor did he tell Montella the quantity of pipes to be loaded. While Piper insisted that he did tell Montella how many pipes were to be loaded and that he ordered three pipe beds, including the one at No. 2 hatch that was to stow 72 pieces of pipe according to the Stowage Plan, these statements were denied by Montella and it was a function of the jury to decide which witness to believe.

It appears from Piper's deposition that he was not present at the time of the loading and stowage and that he did nothing to supervise the operation. Later, he did appear at the scene of the accident. Assuming, as we must, that Piper had failed to give the necessary information to The Carpenters, we think it was proper for the jury to conclude that it was negligence not to give this information to those who needed it and that it was also negligence not to do something by way of supervision to cure this omission. There is no evidence from Piper or any other witness that he had given any information about the pipes, correct or incorrect, to the stevedore. That the jury could have found that the accident was caused by the overloading of the pipe crib is perfectly plain to us. The testimony that, even if additional pipes are loaded at the top of the pile and in the middle, there are lateral forces at work in the pipe crib, is not disputed. Moreover, this is a simple matter of physics, and the height of the pile of pipes and the breaking of one or more of the uprights support the inference of overloading. The jury did not have to believe Montella's opinion that one of the drafts had been carelessly handled and hit one of the uprights and split it.

That something went wrong cannot be doubted. The third pipe bed at hatch No. 2 was not built. Before the accident Piper did not even look at the pipe beds

that were built and he did not know that the third pipe bed had not been built. A large quantity of pipes were stowed athwartship on top of the hatch covers at hatch No. 1. The loading of pipes in the starboard pipe bed was up to the top of the uprights or higher. And the necessary information for the proper conduct of the loading and stowage operation had not been given to those to whom the information was indispensable if they were to do a proper job. When these pieces of proof are put together, we think there was ample proof to justify a finding that the shipowner had failed to give this particular part of the loading and stowage operation the necessary supervision, and that this failure of supervision was a proximate cause of the accident. This same combination of items of proof in the testimony of the various witnesses we think justifies the finding that the shipowner was not entitled to indemnity from ITO because the shipowner had "by some action or inaction * * * prevented, hindered or seriously handicapped ITO in performing its workmanlike job."

For some reason, which is not clear to us, the shipowner seems to think that "inaction" by the shipowner could not possibly constitute negligence. We are unaware of any general distinction between "action" and "inaction" in the field of liability for negligence. Everything depends upon the facts and circumstances of the particular case. Here there was evidence from which the jury might find that, because of the misinformation given by Piper to Montella concerning the requisite number and location of the pipe beds to be built and his failure to advise concerning the large number of pipes and the places where they were to be stowed, as appeared in the Stowage Plan, there resulted the confusion and excess of pipes that the jury could have found were a proximate cause of the overloading. In the hurry and bustle of attempting to conclude the stowage in time for the vessel to sail on November 5th the jury might have found that the shipowner was negligent in ordering too much pipe to be loaded

at hatch No. 1 or that the shipowner had ordered too much pipe to be stowed on the weather deck of the vessel in the first place. The jury may well have thought that, had Piper been at the scene at the time the stowage of the pipes commenced, he would have at once known that the directions he thought he had given had been disregarded and that in the endeavor to stow at hatch No. 1 more pipes than the crib would hold there was a probability of overloading the crib.

### III

### The Law

#### A

■ One of the most interesting developments of judge-made law in modern times commenced with the decision by the Supreme Court in Seas Shipping Co., Inc. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), which treated longshoremen and other shore workers as seamen because the work by these longshoremen and shore workers was said to be the same as was anciently performed by seamen. This made it possible for these longshoremen and shore workers to by-pass the limited recoveries provided by the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C., Sections 901ff, and to obtain very much larger recoveries by way of damages fixed by the juries who decided the cases under the Jones Act. In the course of time we faced an infinite variety of cases where there was interplay between the shipowner's warranty of seaworthiness of the vessel and its appurtenant appliances and equipment, the newly expanded implied contract of workmanlike performance and the long standing doctrine of negligence. It was not very long before the various court decisions had construed the warranty of seaworthiness and the doctrine of negligence in so many different ways as to make it difficult or perhaps impossible for conscientious judges to know how to instruct juries or make decisions in specific cases. That the two rules, unsea-

worthiness and negligence, were wholly distinct and separate was finally clarified by the landmark opinion of Mr. Justice Stewart in Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960).

In the course of time this Court decided Grillea v. United States, 232 F.2d 919 (1956), and there ensued a number of decisions both in the Second Circuit and in other circuits that interpreted in various ways situations where a negligent act by the stevedore was held to be or not to be the creation of a condition that made the vessel unseaworthy. On the one hand, it was thought that if the single act was more than simply part of the "continuous course of operation" of the stevedore, unseaworthiness of the vessel might be found, whereas if the defect was solely an isolated instance that arose in the course of the work, it was negligence on the part of the stevedore and not unseaworthiness of the vessel. On the other hand, some cases held that unseaworthiness could not result from operative negligence. Some of the decisions of this Court, and particularly the dissent of our brother Friendly in Skibinski v. Waterman Steamship Corporation, 360 F.2d 539 (1966), indicated the unsatisfactory state of affairs and the conflicts of authority in the various circuits. Fortunately for us, this difference of opinion was set at rest by the Supreme Court in 1971 in Usner v. Luckenbach Overseas Corporation, et al., 400 U.S. 494, 91 S.Ct. 514, 27 L.Ed.2d 562. Again, the clarifying opinion of the court was written by Mr. Justice Stewart. In that case the longshoremen were stowing cargo from a barge positioned alongside the vessel. The winchman operating the winch and boom at a hatch had lowered the draft, but he did not lower it far enough. One of the longshoremen motioned to the flagman standing on the deck of the ship to direct the winch operator to lower the fall farther. But the winchman lowered the fall too far and too fast and the swing of cargo knocked one of the longshoremen to the deck of the barge and caused his injuries. This is precisely the same as if, in the present case, the winchman, instead of lowering the two drafts of pipes gently into the pipe crib, had dropped them down with a bang and thus dislodged some of the pipes. And this in turn is the equivalent of the single, separate act of overloading in the case before us which caused the breaking of the uprights and a dislodgment of the pipe which rolled upon the plaintiff's foot. Here we see a perfect illustration of the difference between unseaworthiness and operative negligence.

We can find no such inconsistency between the finding that the vessel was not unseaworthy and the finding that the accident was caused by the shipowner's negligence, as is claimed by the shipowner on this appeal. The decision in Usner repeats the teaching of Mitchell that there is a "complete divorcement of unseaworthiness liability from concepts of negligence." The Court stated, 400 U.S. at page 500, 91 S.Ct. at page 518:

> What caused the petitioner's injuries in the present case, however, was not the condition of the ship, her appurtenances, her cargo, or her crew, but the isolated, personal negligent act of the petitioner's fellow longshoreman. To hold that this individual act of negligence rendered the ship unseaworthy would be to subvert the fundamental distinction between unseaworthiness and negligence that we have so painstakingly and repeatedly emphasized in our decisions.

In footnote 19 the Supreme Court expressly rejected the interpretation of Mascuilli v. United States, 387 U.S. 237, 87 S.Ct. 1705, 18 L.Ed.2d 743 (1967) that negligence might create "instantaneous unseaworthiness," an interpretation which the Second Circuit had adopted in Candiano v. Moore-McCormack Lines, Inc., 382 F.2d 961 (1967), cert. denied, 390 U.S. 1027, 88 S.Ct. 1416, 20 L.Ed.2d 284 (1968).

Although the Supreme Court in Usner spoke to a situation in which neither the shipowner not the crew were involved in the accident, the logic of the opinion applies with equal force to situations in

which an isolated act of the shipowner proximately caused the accident. The jury might properly have concluded that the shipowner's inadequate instructions to The Carpenters created a further duty to supervise the actual loading of the pipes and that the breach of this latter duty as an excessive number of pipes were loaded into the crib was the isolated event which cast liability on the shipowner for negligence.

## B

Although the stevedore was negligent, the jury properly found on sufficient evidence that the conduct of the shipowner precluded indemnity because the shipowner "by some action or inaction * * * prevented, hindered or seriously handicapped ITO in performing its workmanlike job."

It is not simply the complete failure of Piper or any other representative of the shipowner to supervise the loading and stowage at hatch No. 1, it is the prior conduct and statements of Piper, which were "active," which created the situation which made the supervision especially necessary. Probably the jury found that this was a combination of "action" and "inaction."

It is historically true that the recovery of indemnity originated in cases where the shipowner was held liable for a breach of the absolute warranty of seaworthiness where the condition of unseaworthiness had been caused by the conduct of the stevedore. DeGioia v. United States Lines Company, 304 F.2d 421 (2d Cir. 1962); Ryan Stevedoring Co., Inc. v. Pan-Atlantic Steamship Corporation, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956); Weyerhaeuser Steamship Co. v. Nacirema Operating Co., Inc., 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491 (1958). And the right to indemnity has been extended to a case where there was a finding of negligence on the part of the shipowner. Drago v. A/S Inger, 305 F.2d

139 (2d Cir.), cert. denied sub nom., Daniels & Kennedy, Inc. v. A/S Inger, 371 U.S. 925, 83 S.Ct. 292, 9 L.Ed.2d 232 (1962).

It is clear that theories of "active or passive" or "primary or secondary" negligence are not appropriate in this type of case.

The shipowner was entitled to indemnity "absent conduct on its part sufficient to preclude recovery" and "[t]he evidence bearing on these issues * * * was for jury consideration under appropriate instructions." Weyerhaeuser Steamship Co. v. Nacirema Operating Co., Inc., 355 U.S. 563, 567, 78 S.Ct. 438, 441, 2 L.Ed.2d 491 (1958). The allowance or disallowance of indemnity in this type of case depends upon a balance or interplay of the doctrines of unseaworthiness, negligence and breach of the implied contract of workmanlike performance that Judge Clark, in the leading case of DeGioia v. United States Lines Company, 304 F.2d 421 (2d Cir. 1962), stated as follows, at p. 426:

> The function of the doctrine of unseaworthiness and the corollary doctrine of indemnification is allocation of the losses caused by shipboard injuries to the enterprise, and within the several segments of the enterprise, to the institution or institutions most able to minimize the particular risk involved.

This test was approved and applied by the Supreme Court in Italia Societa v. Oregon Stevedoring Co., Inc., 376 U.S. 315, 324–325, 84 S.Ct. 748, 11 L.Ed.2d 732 (1964).

We think it clear that the party to this case most able to minimize the particular risk involved was the shipowner since, on sufficient evidence, the jury found that there was "action or inaction on the part of the shipowner which prevented, hindered, or seriously handicapped the stevedore in performing a workmanlike job."

Affirmed.[1]

1. As Conceicao was injured on November 5, 1970, the new provisions of the Longshoremen's and Harbor Workers' Compensation Act Amendments of 1972, 86 Stat. 1251, are not applicable. See Cooper Stevedoring v. Fritz Kopke, Inc., 417 U.S. 106, 94 S.Ct. 2174, 40 L.Ed.2d 694 (1974).